# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1674V
UNPUBLISHED

| | |
|---|---|
| DAVID GRISWOLD,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: March 30, 2022<br><br>Special Processing Unit (SPU);<br>Findings of Fact; Statutory Six Month<br>Severity Requirement; Ruling on<br>Entitlement; Table Injury; Influenza<br>(Flu) Vaccine; Guillain-Barre<br>Syndrome (GBS) |

*William I. Goldsmith*, Goldsmith & Hull, APC, Northridge, CA, for Petitioner.

*Tyler King*, U.S. Department of Justice, Washington, DC, for Respondent.

### **FINDINGS OF FACT AND RULING ON ENTITLEMENT**[1]

On October 29, 2019, David Griswold filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") caused-in-fact by the influenza ("flu") vaccine he received on October 31, 2016. Petition at 1, ¶¶ 2, 20. He further alleges that he suffered the residual effects of his GBS for more than six months. *Id.* at ¶ 21; *see* Section 11(c)(1)(D) (the Vaccine Act's severity requirement).

---

[1] Because this unpublished Ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

While acknowledging that GBS was listed as an active problem in medical records more than six months post-vaccination, Respondent insists "there is no evidence of neurological sequelae that were more likely than not related to GBS in any medical visit after February 2017." Rule 4(c) Report at 7. Thus, he maintains that Petitioner has failed to satisfy the Vaccine Act's severity requirement. *Id.* at 6; *see* Section 11(c)(1)(D)(i) (requiring more than six months of sequelae in cases not involving death or inpatient hospitalization and surgical intervention). However, Respondent acknowledges that Petitioner's claim satisfies the GBS Table criteria, and otherwise meets the requirements for compensation under the Vaccine Act. Rule 4(c) Report at 6, 6 n.5 (specifically addressing the requirements of Sections 11(c)(1)(B)(1)(i)(I) and 16(a)(2)).

For the reasons set forth below, I find Petitioner suffered the residual effects of his GBS for more than six months, and he has satisfied the other requirements of a compensable Table GBS injury. Petitioner is thus entitled to compensation under the Vaccine Act.

## I.  Relevant Procedural History

Mr. Griswold filed his Petition without medical records on the eve of the expiration of the time to initiate a claim under the Vaccine Act's three-year statute of limitations.[3] Over the subsequent four-month period, he filed his birth certificate, two declarations signed under penalty of perjury pursuant to 28 U.S.C.A. § 1746, and some of the required medical records. Exhibits 1-4, First and Second Declarations, ECF Nos. 6-7, 11-12. Thereafter, the case was activated and assigned to the Special Processing Unit (OSM's process for attempting to resolve certain, likely-to-settle claims). ECF No. 14.

During the initial status conference conducted on April 2, 2020, the parties discussed prior medical records which appeared to be outstanding and the need for additional evidence to establish that Petitioner suffered the residual effects of his GBS for more than six months. ECF No. 17. Petitioner was ordered to file any outstanding prior medical records and a detailed affidavit addressing his medical treatment and condition prior to and after vaccination. *Id.* After several requests for additional time, Petitioner filed a third declaration explaining that he rarely sought medical care prior to vaccination due to his lack of medical insurance - not obtained until October 2016, and needed only limited treatment for knee pain. Third Declaration, filed Nov. 16, 2020, ECF No. 24.

---

[3] Alleging bilateral weakness in his hand beginning on November 7, 2016, Petitioner was required to file his Petition prior to November 7, 2019. *See* Section 16(a)(2) (requiring that a petition be filed within 36 months of the first symptom or manifestation of a petitioner's injury).

On March 22, 2021, Respondent filed his Rule 4(c) Report contesting entitlement and identifying additional medical records which were needed. ECF No. 26. In response, Petitioner filed a brief from Tahlia Spector, M.D., F.A.C.E.P.,[4] opining that the medical record as it currently stood supported a finding of at least six months of residual GBS symptoms, and a status report requesting additional time to provide Petitioner's inpatient rehabilitation records. ECF Nos. 27, 28. He filed the outstanding medical records on August 11, 2021. Exhibit 5, ECF No. 30.

During a telephonic status conference on December 16, 2021, Petitioner indicated that he had tracked down one of his former primary care providers ("PCPs"), who had left the clinic where she treated Petitioner, and hoped to obtain additional evidence from her within the next few weeks. ECF 32. On March 7, 2022, Petitioner filed the medical record from a February 28, 2022 visit with the treating physician, Ana S. Lopes, M.D., at her current urgent care clinic. Exhibit 6, ECF No. 34.

## II.     Finding of Fact Regarding Duration

At issue is whether Petitioner continued to suffer the residual effects of GBS for more than six months. Section 11(c)(1)(D)(i) (statutory six-month severity requirement).

### A.     Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). "The medical

---

[4] Dr. Spector is an Associate Clinical Professor of Medicine at the University of California Los Angeles ("UCLA"), David Geffen School of Medicine at UCLA. Her brief will be referred to as "Dr. Spector's Expert Report."

3

records made at the time treatment was sought or provided are far more reliable than the witnesses' testimony, five years later, to the contrary." *Id.* at *20.

However, this rule does not always apply. The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998). "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.,* 23 Cl. Ct. 726, 733 (1991) (quoting with approval the standard used by the special master below), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir. 1992). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Claims Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other relevant and reliable evidence contained in the record. *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### B.     Analysis

I make the finding regarding six-month sequelae after a complete review of the record to include all medical records, declarations, expert reports, arguments, and additional evidence. Specifically, I highlight the following:

- On October 31, 2016, Petitioner was seen as a new patient at the Facey Clinic for several years of bilateral knee pain. Exhibit 2 at 306. He reported that taking glucosamine, receiving a cartilage injection administered by a "backyard" doctor, and going to a pain clinic had failed to alleviate his pain. Indicating that he was required to do a lot of bending and lifting, Petitioner stated he "[wa]s finding decreasing difficult[y] to try to work." *Id.*; *see id.* at 204 (indicating Petitioner owns his own pool company). Petitioner was assessed as having bilateral knee pain, as well as a possible hernia, hypertension, and alcohol dependency. *Id.* at 307. He received the influenza and pneumococcal conjugate 13-valent vaccines at this visit. *Id.* at 89.

- Eight days post-vaccination, on November 8, 2016, Petitioner returned to the Facey Clinic, complaining of bilateral weakness and numbness in his hands which started the previous day. Exhibit 2 at 304. The PCP he saw noted that Petitioner started taking medication for hypertension a week earlier, had osteoarthritis in both knees, did not smoke, and consumed approximately four to five ounces of hard alcohol each evening. Unable to rule out the possibility of a stroke, the PCP advised Petitioner to go to the emergency room by ambulance. *Id.*

- Although he refused to travel by ambulance – preferring his private vehicle, Petitioner went at the emergency room as directed. Exhibit 2 at 301, 304. He again reported bilateral weakness and numbness in his hands since yesterday and an inability to open one of his hands, presumably his left in which he experienced greater weakness. *Id.* at 279, 300. Petitioner denied any numbness, tingling, or weakness in his legs and reported suffering five days of diarrhea a week earlier which he attributed to over-the-counter magnesium tablets and receiving the flu vaccine the previous week. *Id.* at 279. A cervical MRI revealed "no evidence of a cord lesion or a significant radiculopathy," and Petitioner was observed exhibiting depressed reflexes throughout believed to be "secondary to a new process versus secondary to a chronic neuropathy from alcoholism." *Id.* at 268. He was admitted to the hospital. *Id.*

- After his neurologic evaluation, Petitioner reported weakness in his lower extremities as well. Exhibit 2 at 268. The results of a lumbar puncture revealed elevated proteins levels, and Petitioner was diagnosed with acute inflammatory demyelinating polyneuropathy ("AIDP") and prescribed IVIG treatment. *Id.* On his fourth day of hospitalization at least one treating physician considered the flu shot Petitioner received as a "[p]ossible trigger." *Id.* at 266.

5

- After finishing IVIG treatment, Petitioner was recommended for acute rehabilitation due to his "overall rehabilitation needs, co-morbidities, and risk for complications or poor outcome at a lower level of care." Exhibit 2 at 242. In addition to his bilateral knee pain, it was noted that he had developed gout. *Id.* at 254.

- When first assessed for in-patient rehabilitation on November 15, 2016, Petitioner was unable to walk without assistance. Exhibit 5 at 993-94. The next day, he was described as unable to dress himself without assistance, due in part to a lack of strength in his hands. *Id.* at 1012. However, two days later on November 18, 2016, his hand strength was described as gradually improving. *Id.* at 1056. Because some of his difficulties walking were caused, not by fatigue, but by knee pain (*id.* at 1036), he was given soft knee braces (*id.* at 1073).

- By November 19, 2016, Petitioner still experienced bouts of fatigue, but had to be reminded to use his two wheeled walker for safety. Exhibit 5 at 1080. On his last day of inpatient rehabilitation, Petitioner was observed to be walking and dressing himself, working on his endurance, and requiring only one break to rest. *Id.* at 1136. Although Petitioner sometimes required additional time, he was able to pull out his chair to sit down, pick-up objects off the floor, descend stairs, and eat unassisted. It was recommended that he seek treatment for his right knee pain post-discharge from an orthopedist. *Id.* When discharged on November 23, 2016, it was noted that Petitioner had no complaints of pain or discomfort. *Id.* at 1156.

- On November 28, 2016, Petitioner was seen at the Facey clinic for a follow-up appointment of his hospitalization and knee pain. Exhibit 2 at 227. At this visit, Petitioner described being unable to move his arms or sit up due to while hospitalized for GBS. *Id.* He was referred to an orthopedist at the Facey Clinic for treatment of his knee pain. *Id.* at 228.

- At the orthopedic appointment on December 5, 2016, Petitioner described several years of knee pain which was worse in the right knee, reported that a steroid injection several years ago helped, stated that he felt increasing pain at the end of the day due to a need to walk and stand while working, and indicated that he preferred to try nonsurgical options before having a knee replacement. Exhibit 2 at 224. Observed as having a normal gait, coordination, and muscle strength, Petitioner was administered cortisone injections in both knees. *Id.* at 225.

- Petitioner returned to the Facey Clinic for a follow-up appointment with a PCP on December 19, 2016. Exhibit 2 at 221. Although conditions such as his knee pain, hernia, and hypertension were also discussed, the primary purpose of the appointment appears to be GBS. *Id.* The assessment section includes Petitioner's hypertension and bilateral knee pain, and contains separate entries for GBS following vaccination and hand weakness. *Id.* at 222. The proposed plan includes notations listing the hypertension medication prescribed and stating that the steroid injections had improved his knee pain, and an entry simply stating, "[m]uscle weakness and demyelinating." *Id.* at 223.

- At his next visit to the Facey Clinic on February 20, 2017, Petitioner was seen by Dr. Ana Lopes.[5] Exhibit 2 at 216. Dr. Lopes discussed Petitioner's knee pain, chronic gout, hypertension, and alcohol use but provided the most detail regarding his GBS. *Id.* at 216. After describing Petitioner's severe symptoms while hospitalized and stating that "he feels [his] muscle[s] came back pretty quickly," Dr. Lopes noted that Petitioner had declined at home PT, was working on getting better, and was walking through yards and stairs. *Id.* When prescribing treatment, she again mentioned Petitioner had declined further PT. She "encouraged him to continue to stay active" and instructed him not to receive the flu shot again. *Id.* at 217.

- Petitioner visited the orthopedist again on March 6, 2017, for treatment of his bilateral knee pain. Exhibit 2 at 214. At that time, Petitioner reported that he was "not even able to walk even smaller distances secondary to severe pain." *Id.* It was also noted that Petitioner developed GBS after receiving the flu shot last fall and had "mild weakness of [the] bilateral lower extremities." *Id.* Due to the relief obtained from past cortisone injections, the orthopedist recommended euflexxa injections.[6] Exhibit 2 at 215. Petitioner returned to the orthopedist twice in March and once in April to receive these injections. *Id.* at 208-13.

---

[5] Prior to this appointment, Petitioner was usually treated by a different PCP, James Tashiro, M.D. *E.g.,* Exhibit 2 at 221, 227, 306. It appears Dr. Lopes took over Dr. Tashiro's duties as Petitioner's PCP at this time. She is the treating physician who Petitioner recently saw on February 28, 2022. Exhibit 6 at 1-6.

[6] Euflexxa is a one percent sodium hyaluronate injection "used to relieve knee pain due to osteoarthritis." *See* https://www.euflexxa.com/ (last visited on Mar. 25, 2022).

- On May 22, 2017, Petitioner was again seen by Dr. Lopes, regarding his GBS, severe right knee pain, and possible hernia. Exhibit 2 at 203. Describing a complaint of GBS following the flu vaccine, Dr. Lopes reported that Petitioner declined PT, that she had encouraged him again to stay active, and that he should not receive the flu vaccine again. *Id.* Petitioner reported that he and his wife had moved in with his mother three months ago, that he was depressed and had little energy, that his pool business was in debt and his wife couldn't work, and that he felt he could not undergo knee replacement surgery because he couldn't afford to miss work due to his financial concerns. *Id.* at 203-05. Dr. Lopes performed a suicide assessment, reviewed Petitioner's current medications, and prescribed additional medication for his depression. *Id.* at 206.

- Throughout the remainder of 2017 and early 2018, Petitioner sought treatment for his hernia and knee pain. *E.g.,* Exhibit 2 at 201-02 (referral for potential hernia repair in June 2017), 112-120 (visit regarding knee osteoarthritis and pain). Petitioner's GBS remained on the list of active problems during this time. *Id.* At a January 2, 2018 visit with an orthopedic surgeon to discuss knee replacement surgery, Petitioner reported neurologic weakness. *Id.* at 112. At his pre-op appointment on March 19, 2018, the orthopedic surgeon updated and again included GBS on Petitioner's list of active problems. *Id.* at 104.

- It appears that Petitioner's knee replacement surgery was delayed due to aortic insufficiency discovered in April and repaired in June 2018.[7] Petitioner did not undergo his right knee replacement until January 2019. Exhibit 2 at 60. The first time GBS or AIDP was omitted from the active problem list can be found in the record from pre-op examination performed in early January 2019. Exhibit 2 at 62. In hospital records from Petitioner's January 17-19 hospitalization and right knee replacement, Petitioner's GBS, aortic insufficiency, and gout are described as resolved. *Id.* at 13.

- On February 28, 2022, Petitioner visited Dr. Lopes for ongoing hand weakness from wrists to fingertips which started with his GBS and caused

---

[7] Within the medical records from the Facey Clinic are records from visits to the Cardiovascular Consultants Medical Group showing Petitioner was seen for fatigue and shortness of breath in April 2018. Exhibit 2 at 185. It was noted that Petitioner's high blood pressure had been poorly controlled. Testing revealed severe aortic insufficiency and left ventricular enlargement. *Id.* It appears Petitioner underwent an aortic valve replacement in June 2018. *See id.* at 172. Petitioner has yet to provide these copies of these medical records obtained directly from the cardiologist due to their move to an archived storage facility. *See* Third Declaration at ¶ 17.

8

>    him to drop objects. Exhibit 6 at 1. After examining x-rays taken that day, Dr. Lopes observed "bilateral deformities noted [to be] consistent with his history of Dupuytren's contractures,[8] no acute fracture, [and] . . . some arthritic changes." *Id.* Reporting that he couldn't carry his pool equipment or perform his work like before, Petitioner stated that "he was working 6 days a week [and] . . . currently works 5 - half days." *Id.*
>
> - In the medical records filed, Dupuytren's contractures first appears in the list of active problems in early January 2018. Exhibit 2 at 114. Although similarly included in the medical records from later visits, none of the records contain a discussion of or time frame for this condition. *Id.* at 6-116.

The above medical entries show that Petitioner's GBS first manifested as bilateral hand weakness and numbness on November 7, 2016, approximately seven days post-vaccination. After his hospitalization the following day, his symptoms progressed - affecting his lower extremities as well. When assessed for in-patient rehabilitation on November 15, 2016, Petitioner was unable to walk or dress himself without assistance. Throughout his rehabilitation, his progress walking and standing was impeded by his chronic and pre-existing knee pain.

However, Petitioner made exceptional progress during his in-patient rehabilitation. By his discharge on November 23, 2016, Petitioner was able to walk, dress himself, and perform other daily tasks unaided. In contrast, his chronic knee pain continued to be severe, and he was encouraged to pursue treatment for that condition.

During the subsequent year, Petitioner visited an orthopedist at the Facey Clinic on several occasions. As expected, the medical records from these visits focus on Petitioner's chronic knee pain. They contain entries describing Petitioner as having a normal gait and coordination.

Petitioner also visited PCPs at the Facey Clinic for follow-up appointments regarding his GBS and other conditions including his knee pain on four occasions from November 28, 2016 to May 22, 2017. As indicated in the medical record from his December 2016 visit, he continued to experience weakness and numbness in his hands even after his discharge. And although there are notations indicating Petitioner exhibited a normal gait and coordination, there is little information in these records regarding his

---

[8] Dupuytren's contractures is "a usual autosomal dominant condition consisting of flexion contracture of a finger caused by shortening, thickening, and fibrosis of the palmar fascia." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 410 (32th ed. 2012).

9

upper extremities. In general, these medical records do not describe specific, ongoing symptoms and contain only a cursory description of the complaint and actions taken.

Petitioner's expert Dr. Spector argues that the continued inclusion of AIDP or GBS in the list of active problems shows Petitioner suffered residual effects of his GBS until at least January 2019. Dr. Spector's Expert Report at 1, 7. She emphasizes that there is no evidence that Petitioner's GBS had resolved until that time. *Id.* at 7. At a minimum, she maintains that the treatment of GBS as a prioritized diagnosis until late May 2017 is sufficient to establish six months of sequela. *Id.* at 6-7.

In response, Respondent insists that the description of GBS as an active problem alone is not sufficient to prove six-months of residual effects. Rule 4(c) Report at 6-7. Regarding the report of neurologic weakness in early January 2018, Respondent emphasizes that the results of the muscular and neurologic examinations performed during that visit were normal. *Id.* (referencing Exhibit 2 at 112).

In *Kirby*, the Federal Circuit explained that its holding in *Cucuras* was limited to "the unremarkable proposition that it is not erroneous to give greater weight to contemporaneous medical records than to later, contradictory testimony" but should not be interpreted as a finding that "the medical records are presumptively accurate and complete, . . . that when a person is ill, he reports all of his problems to his doctor, who then faithfully records everything he is told." *Kirby,* 997 F.3d at 1382-83. In that case, the Circuit determined that the special master's finding of six-month sequela was not arbitrary or capricious, despite the lack of recorded symptoms and the *Kirby* petitioner's general statements of feeling fine or having no complaint. *Id.* at 1383.

None of the medical records from Facey Clinic provide much detail about Petitioner's condition. Despite the need to focus on the more immediate issue – Petitioner's depression and suicidal thoughts, Dr. Lopes clearly discussed Petitioner's GBS and provided instructions regarding treatment on May 22, 2017. And there is no evidence indicating Petitioner's GBS had resolved until much later.

In this case, to satisfy the Vaccine Act's severity requirement Petitioner must show that he suffered GBS sequelae beyond early May 2017. I find that the record supports a finding of GBS sequelae at least through late May 2017. Accordingly, I find there is preponderant evidence to establish Petitioner suffered the residual effects of GBS for more than six months.

### III.     Requirements for Entitlement

Respondent has expressed his belief that "[P]etitioner's claim meets the Table criteria for GBS" (Rule 4(c) Report at 6), and I agree with that assessment. *See* 42 C.F.R. § 100.3(a)(XIV)(D); 42 C.F.R. § 100.3(c)(15) (Qualifications and Aids to Interpretation for GBS). Thus, Petitioner need not prove causation. Section 11(c)(1)(C). However, Petitioner must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

As I have determined in this ruling, the record supports a finding that Petitioner suffered the residual effects of his GBS for more than six months. *See supra* Section II.B.; Section 11(c)(1)(D)(i) (the Vaccine Act's six-month severity requirement). Additionally, the vaccine record shows Petitioner received the flu vaccine at the Facey Clinic in Mission Hills, California. Exhibit 2 at 89; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, there is no evidence that Petitioner has collected a civil award for his injury. *See* Section 11(c)(1)(E) (lack of prior civil award). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### IV.     Appropriate Amount of Compensation

Although I have determined there is sufficient evidence to show Petitioner suffered the residual effects of his GBS until at least May 2017, I am not ruling on the overall length of his sequela. There is evidence showing Petitioner may have experienced some residual weakness as late as January 2018, and GBS or AIDP was listed as an active problem until January 2019. However, there are no entries showing that Petitioner was seen for or received treatment of GBS *beyond* May 2017. Thus, the lack of GBS-related entries signifies that, at a minimum, any symptoms Petitioner continued to suffer were not all that severe. Certainly, symptoms Petitioner may have suffered beyond May 2017 were not significant enough to prioritize a complaint of GBS over other conditions Petitioner was experiencing at that time – his knee pain, hernia, and cardiac issues.

Petitioner maintains that he continues to suffer hand weakness related to his GBS, and he recently visited Dr. Lopes complaining of these symptoms. Exhibit 6 at 1-6. But this assertion is undercut by the January 2019 entry describing Petitioner's GBS as resolved. Exhibit 2 at 13. Additionally, Dr. Lopes observed evidence of arthritis and deformities related to Dupuytren's contractures – a condition noted in Petitioner's medical records beginning in late 2017. Exhibit 6 at 1; Exhibit 2 at 114 (respectively). These co-morbidities would naturally affect Petitioner's ability to use his hands.

In his first declaration, Petitioner emphasized the difficulties he encountered performing work-related tasks after his hospitalization for GBS. First Declaration at ¶¶ 29-33. He attributed these difficulties solely to residual weakness and numbness in his hands. *Id.* at ¶¶ 29-32. However, Petitioner also complained of an inability to work due to his severe osteoarthritis and knee pain prior to vaccination - in the fall of 2016. Exhibit 2 at 306. He continued to suffer severe pain in both knees, described as worse in his right knee, until at least early 2019 when he underwent a right knee replacement. And, in his second declaration, Petitioner acknowledged the surgeries he underwent in June 2017 for a hernia repair, in April 2018 for an aortic valve replacement, and in January 2019 for a right knee replacement. Second Declaration at 19, 21-22.

The fact that the medical records from treatment received in 2018-19 focused on these co-morbidities and did not include treatment for any GBS symptoms beyond May 2017 is evidence of the mildness of any residual GBS symptoms. And beginning in 2018, these records included evidence of Dupuytren's contractures which also affect Petitioner's ability to grasp and hold objects. Petitioner should consider all co-morbidities and the relative mildness of any later GBS symptoms when finalizing his demand. Although I do not want to downplay the difficulties associated with any GBS illness, the record as it presently stands suggests that Petitioner's GBS was less severe, and his recovery was much quicker than often seen in other Program cases. Any damages award issued in this case will take the foregoing into account.

## V.     Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table GBS and the Vaccine Act's severity requirement needed for both Table and non-Table claims. Petitioner is entitled to compensation in this case.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master